UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **METROPLEX ATHEISTS,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00736-O |
| | § | |
| **CITY OF FORT WORTH and** | § | |
| **DOWNTOWN FORT WORTH, INC.,** | § | |
| | § | |
| Defendants. | § | |

**OPINION & ORDER ON PRELIMINARY INJUNCTION**

Before the Court are Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 3), and accompanying Brief (ECF No. 4), both filed July 17, 2023; Defendant City of Fort Worth's Response (ECF No. 18), filed August 1, 2023; Defendant Downtown Fort Worth, Inc.'s Response[1] (ECF No. 21), filed August 2, 2023; and Plaintiff's Reply (ECF No. 19), filed August 3, 2023. Having considered the briefing, arguments, and evidence, the Court **ORDERS** that the Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 3) is **DENIED**. The Court also finds Plaintiff's Motion for Hearing on Preliminary Injunction (ECF No. 16), filed July 27, 2023, to be **MOOT**.

I.   **BACKGROUND**

This case is about banners. On many of Fort Worth's streets and in famous parts of town, visitors and citizens regularly see colorful banners hung in rows on top of the light poles that line

---

[1] In its Response, Defendant Downtown Fort Worth, Inc. argues that it simply implemented the directions of Defendant City of Fort Worth with respect to the challenged banner policy. While the Court makes no determination on Defendant Downtown Fort Worth, Inc.'s liability at this time, the Court presumes that the actions of Defendant Downtown Fort Worth, Inc. are attributable to Defendant City of Fort Worth for the purposes on this analysis. Since Defendant Downtown Fort Worth, Inc.'s Response (ECF No. 21) otherwise raises the same issues as Defendant City of Fort Worth's Response (ECF No. 18), the Court does not independently address Defendant Downtown Fort Worth, Inc.'s Response.

the street or sidewalks. Throughout the year, these poles' banners advertise a variety of culturally significant events like conferences, art exhibits, TCU football games, rodeos, citywide festivals, and many others.

To source the material for these banners, Defendant City of Fort Worth (the "City") established a "Banner Policy and Procedure" ("Banner Policy"). These procedures dictate the qualifications an event or exhibit must meet to use the City's poles. The Banner Policy dictates four standards for events that wish to use the program: (1) only nonprofits may use it; (2) it must be held in Fort Worth and open to the public; (3) it must be of common interest to the general community or recognize and/or contribute to the cultural fabric of the City; and (4) if it is an offsite banner, it is restricted to the promotion of special events or exhibits held on specific dates. The City retains decision-making authority but delegates much of the administration of the Banner Program—especially in its famous downtown area—to Defendant Downtown Fort Worth, Inc. ("DFWI").

In 2019, Plaintiff Metroplex Atheists applied for the program. Plaintiff is a nonprofit group of atheists, agnostics, and free thinkers who host various events advocating for the separation of church and state. The 2019 event was held at the Fort Worth Botanical Gardens and was organized to educate the public and raise awareness as to the divisive nature of the national motto "In God We Trust." After stepping through the application process, the City determined that Plaintiff's event met all the qualifications for promotion. As a result, poles in downtown Fort Worth displayed yellow banners emblazoned with blue lettering declaring "In NO God We Trust" for fourteen days. Around 200 people showed up to the actual event.

Many citizens in Fort Worth were not happy about this use of municipal property and raised their frustrations directly to City Hall. Indeed, a political controversy over the banners ensued that

caused former Mayor Betsy Price to take to Twitter. On Twitter, Mayor Price stated that the organization "follow[ed] the policies and procedures set forth by the City and Downtown Fort Worth, Inc." ECF No. 27 at 11. Mayor Price then stated that the City "must respect freedom of speech." *Id*. The City also released a statement which noted that because Plaintiff met all the Banner Policy's standards, the City found it worthy of promotion.

In late 2022, Plaintiff again sought permission to use Fort Worth's light poles. This time it was for a 2023 event titled "The Dangers of Christian Nationalism." After waiting six months for a response to its application, Plaintiff's application was denied. And, after some waiting, the City informed Plaintiff that its application was denied because the event was not of sufficient "magnitude" to qualify under the Banner Policy.

Plaintiff then appealed the denial to the City Council. Later, the City Attorney informed Plaintiff that the City was considering reworking its policy and had placed a moratorium on the program. On July 17, 2023, Plaintiff sued the City and DFWI under the First Amendment. As its event is fast approaching, Plaintiff now moves for injunctive relief that would require the City to hang its banners.

## II.     LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and will be granted only if the movants carry their burden on all four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (quoting *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005)); *see also* Fed. R. Civ. P. 65. The Court should issue a preliminary injunction only if the movants establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in their favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Scis.,*

*L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). The movant must make a clear showing that the injunction is warranted, and the issuance of a preliminary injunction "is to be treated as the exception rather than the rule." *Id.*

### III. ANALYSIS

To secure preliminary injunctive relief, a plaintiff must first show a substantial likelihood that they will succeed on the merits of their claims. *Daniels Health Scis.*, 710 F.3d at 582. "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Id.* Plaintiff Metroplex Atheists asserts that the Banner Program creates a limited public forum for private speech, thus availing its proposed speech First Amendment protection. As such, Plaintiff must show a substantial likelihood of success on its First Amendment claim. Because Plaintiff fails to show a show a substantial likelihood of success on its First Amendment claim, Plaintiff is not entitled to preliminary injunctive relief, and the Court need not address the remaining three requirements for a preliminary injunction.

Plaintiff fails to show a substantial likelihood of success on its First Amendment claim because the challenged Banner Program represents government speech—not a limited public forum. The distinction between these types of speech is well-rooted in First Amendment jurisprudence. When the government creates spaces for speech and expression by private citizens—like a forum for freewheeling debate—the First Amendment prevents it from discriminating against speakers based on their viewpoint. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995). But when the government speaks alone, the First

4

Amendment does not demand airtime for all views. *Pleasant Grove City v. Summum*, 555 U.S. 460, 464–68 (2009). This is because democracy—done rightly—requires the government to be able to enact its wishes through promoting programs, espousing policy, or engaging in its own processes. *See Walker* v. *Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). This is especially true when a governmental entity chooses how to present itself to the public—including its citizens, visitors, and tourists.[2]

While this seems cut and dry, the line between private forums and government speech is not always clear. This is especially true when the government uses private parties to source its messaging or speaking material—a practice that is perfectly in line with the Constitution when it is done correctly. *See Summum*, 555 U.S. at 468 ("A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message."). Indeed, this case turns on this exact issue. If the speech solicited by the Banner Program qualifies as government speech, Plaintiff's First Amendment challenge will fail. The Court thus addresses this question.

The Supreme Court provides a three-factor test to determine whether government speech is present. The test looks to (1) the history of the expression at issue, (2) the public's likely perception as to who is speaking, and (3) "the extent to which the government has actively shaped or controlled the expression." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589–90 (2022) (citing *Walker*, 576 U.S. at 209–14). The Court addresses each factor in turn and finds that each factor indicates the challenged conduct at issue here is government speech.

---

[2] "Texas offers plates celebrating the many educational institutions attended by its citizens. But it need not issue plates deriding schooling. Texas offers plates that pay tribute to the Texas citrus industry. But it need not issue plates praising Florida's oranges as far better. And Texas offers plates that say 'Fight Terrorism.' But it need not issue plates promoting al Qaeda." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) (internal citations omitted).

### A. The history of the City's Banner Policy indicates that the banners are government speech.

In evaluating the history factor, courts look to the medium of speech used and its historical ties to government. *See Shurtleff*, 142 S. Ct. at 1590–91 (2022) (flags); *Walker*, 576 U.S. at 210–11 (license plates); *Summum*, 555 U.S. at 470–73 (monuments). The Court thus conducts its analysis parallel to the three leading cases on the issue: *Shurtleff*, *Walker*, and *Summum*. Based on this analysis, the Court finds that the history of the City's Banner Policy indicates that the banners are government speech.

In *Shurtleff*—where a religious group sought to fly a flag near Boston's city hall—the Supreme Court held that the historical use of flags weighed in favor of the government. 142 S. Ct. at 1590–91. There, the Supreme Court reasoned that flags—from their origins to their modern-day usage—are tied to government use and convey government messaging especially when flown around or near government facilities or landmarks. *Id.*

Like the flags in *Shurtleff*, light pole banners have a long history of involvement with government speech. From ticker-tape parades to celebrations of different historical districts, many cities display decorative banners on the streetlight poles that line business districts or busy streets. *See* Mary Jean Dolan, *The Special Public Purpose Forum and Endorsement Relationships: New Extensions of Government Speech*, 31 Hastings Const. L.Q. 71 (2004) (discussing similar city banner policies). Most commonly, "they proclaim the identity of the town or shopping district, celebrate a local institution, or promote a public festivity." *Id.* at 128. Indeed, "[c]ities have expressive purposes when initiating a banner program—to be welcoming, aesthetically pleasing, and promote the government's vision of the city at its most attractive." *Id.* at 129. And while the banners in this case are not always affixed to the walls of city hall, they are dotted throughout Fort Worth on public light posts that appear above public sidewalks. It is well known that roads and

6

sidewalks fall under the governments care—so plastering an entire city with uniform messaging is perhaps just as much an endorsement as flying a flag near city hall. The reasoning in *Shurtleff* weighs in favor of the Court's finding that the history of the Banner Policy indicates that the banners are government speech.

In *Walker*—where an organizational plaintiff sought to add Confederate flags to custom Texas license plates—the Supreme Court held that the historical use of license plates favored the government because they historically "communicated messages from the States." *Walker*, 576 U.S. at 210–11. The Court reasoned that because states have used license plate slogans and designs "to urge action, to promote tourism, and to tout local industries," history supports its use as a medium of government speech. *Id.* at 211. Indeed, states use license plates to promote regional things from iodine products to local livestock and rodeo shows. *Id.* at 212.

Like the license plate program in *Walker*, the City also uses its banners to urge action, promote tourism, and tout local culture. To evidence this, the banners "are restricted to promotion of special events/exhibits." ECF No. 18 at 3. And the policy requires that the special events are "of common interest to the general community, or recognize and/or contribute to the cultural fabric of the City." *Id.* Examples provided include "an arts, entertainment, or education related activity; a public social occasion; a sports contest; or a public concert." *Id.* Like license plates, these banners have taken the form of advertising a diverse set of conferences, athletic events, holiday functions, and art exhibits. *Id.* And like license plates, which all invoke the name of the state, the wide array of events advertised by the banners have one thing in common—the City. The reasoning in *Walker* thus supports the Court's determination that the historic factor favors a finding of government speech here.

Lastly, in *Summum*—where a plaintiff sought to erect a monument in a public park—the Supreme Court found that the historical use of government monuments weighed towards government speech. *Summum*, 555 U.S. at 470–71. The Court reasoned that "[w]hen a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure." *Id.* at 470. In doing this, governments consider "such content-based factors as esthetics, history, and local culture." *Id.* at 472. As such, the history factor in *Summum* likewise favored the government.

Here, as in *Summum*, the history of the Banner Policy shows that it is not a bulletin board for every event that happens in the City. Rather, the medium is used by the City to market itself, to highlight the rich cultural environment of Fort Worth, and to point its citizens and visitors to events or exhibits that the City deems "special." ECF No. 18 at 3. To be special, an event must meet the City's stated view of whether it promotes the common interest and cultural fabric of the City. *Id.* In this context, the City teams up with the private sector to convey its own message about its esthetics and local culture—namely, that Fort Worth is a great place to live, work, play, and visit. The reasoning in *Summum* supports the Court's evaluation that the history factor indicates that the banners are government speech.

Though there are similarities between all three leading cases on the issue, Plaintiff argues that the historical application of Fort Worth's policy clearly shows that the speech at issue is not from the government. To prove this, Plaintiff provides three statements by City officials. The Court addresses each in turn, and the Court finds that none of Plaintiff's arguments disturb the Court's decision.

Plaintiff first points to comments made by former Mayor Betsy Price about the Banner Program in response to blowback from the 2019 "In NO God We Trust" banners. On Twitter,

8

Mayor Price stated that the organization had met "the *policies and procedures* set forth by the City and Downtown Fort Worth, Inc." ECF No. 27 at 11 (emphasis added). Mayor Price then stated that the City "must respect freedom of speech." *Id.* Plaintiff argues that these statements evidence that the Banner Program was originally intended as a limited public forum.

But Mayor Price's comments do little to thwart the historical analysis. This is because, as mayor, her comments—much less her tweets—are not binding on the City or instructive to actual policy. *See Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016) ("[U]nder Texas law, the final policymaker for the city of Dallas is the Dallas city council."); *Bolton v. City of Dallas*, 541 F.3d 545, 550 (5th Cir. 2008) (internal quotations omitted) ("State law instead reserves that role for the governing body."). So her comments in the face of political backlash are not instructive of anything but her own views and politicking. Even so, former Mayor Price still emphasized that the City actively maintained and policed its "policies and procedures." ECF No. 27 at 11.

Plaintiff next points to a statement from the City—also issued during the blowback from the 2019 event. The statement says that "[i]f an organization meets the established criteria for purchasing the banners, the [C]ity cannot discriminate or dictate the content unless it contains profanity, threats or other inappropriate images." ECF No. 27 at 11.

This statement is also unconvincing. First, based on the record before the Court, it is unclear if an actual policy maker is speaking since it is unknown who authorized the release of the statement. Second, in the statement, the City again reiterated that it has a policy and "established criteria" in place to qualify for the program. ECF No. 27 at 11. And, evidently, under the City's judgment at that time, Plaintiff's 2019 event met the criteria. This fits with other historical patterns of government speech—like license plates—that have an approval process for customization. *See Walker*, 576 U.S. at 210–11. And third, the City's statement that it "cannot . . . dictate the content"

9

of the banners is patently false. ECF No. 27 at 11. Indeed, the policy at issue states that the City's Director of Transportation and Public Works "shall have sole authority to approve banner applications (including design/*content*)." ECF No. 18 at 9 (emphasis added). When a city's backpedaling apology on Twitter conflicts with the words of a lawfully enacted municipal policy, it is the policy that wins—not the tweet.

Finally, Plaintiff points to the affidavit provided by the City from Assistant City Manager William Johnson. In the affidavit, he states:

> [C]ertain street light poles (or lampposts) may under certain circumstances be used by approved nonprofit organizations to hang certain banners to promote certain events or exhibits designed to benefit the public and the City. It is my understanding that the public would otherwise have no right at all to use such lampposts to display banners.

ECF No. 18 at 16. Plaintiff argues that the statement "the public would otherwise have no right" shows that this forum was created for the public and not for government speech. *Id.* The Court disagrees.

Once again, this statement does little to shift the weight of the historical analysis and ignores the glaring words "benefit the public and the City." *Id.* Caselaw is clear that the use of private speakers in a program does not foreclose the possibility of government speech. *See Summum*, 555 U.S. at 468 ("A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message."). That the public has access—though a limited and qualified access—to the Banner Program does nothing to change the historical view of this program. *See Walker*, 576 U.S. at 210–15. And, lastly, the Assistant City Manager's statement about the light posts reinforces that the light posts are under the City's exclusive control. Only the City approves banners. And only the City oversees the Banner Program.

10

Based on the controlling caselaw, and the insufficiency of Plaintiff's counterarguments, the history of the Banner Policy supports the Court's finding that the challenged banners are government speech.

### B. The public is likely to perceive that the City is speaking through the banners.

In weighing the perception of the public factor, courts look to whether the mediums of speech used "are often closely identified in the public mind with the [government]." *Summum*, 555 U.S. at 472. The Court again conducts its analysis parallel to the three leading cases on the issue—*Shurtleff*, *Walker*, and *Summum*. Based on this analysis, the Court finds that the public is likely to perceive that the City is speaking through the banners.

In *Shurtleff*—the flagpole case—the Supreme Court found that the public perception factor was a toss-up and weighed in neither direction. *Shurtleff*, 142 S. Ct. at 1591. This was because the defendants alleged that private ceremonies were often conducted next to the flag poles during various raisings. *Id.* at 1591. The Court concluded that "a pedestrian glimpsing a flag other than Boston's on the third flagpole might simply look down onto the plaza, see a group of private citizens conducting a ceremony without the city's presence, and associate the new flag with them, not Boston." *Id.* So while "the public would ordinarily associate a flag's message with Boston, that [was] not necessarily true for the flags at issue." *Id.*

Plaintiff introduces no such evidence. Unlike *Shurtleff*, no private ceremonies are implicated in the banner process, and the complete control of setting them up and taking them down falls on the City. The only evidence Plaintiff brings stems from the Twitter posts made by former Mayor Price when she dealt with the blowback of the first event. ECF No. 27 at 11. Again, in the former Mayor's post, she still discussed that the full approval process was required to proceed with a banner. And the blowback from the first event held by Plaintiff shows who the

11

public thought was speaking: the City. Angry citizens did not call Plaintiff to voice concern—they called the City. This case is thus distinguishable from the reasoning in *Shurtleff*.

*Walker*—the license plate case—is also instructive here. There, the Supreme Court found that the public perception factor favored government speech. *Walker*, 576 U.S. at 212–13. This was because, "[t]he State place[d] the name 'TEXAS' in large letters at the top of every plate." *Id.* at 212. From this, the Supreme Court reasoned that "a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message." *Id.* If this were not true, the individual could make a much grander display in "larger letters on a bumper sticker right next to the plate." *Id.* at 212–13.

Like the plaintiff in *Walker*, that had the option to convey its message in other forms, here Plaintiff can post flyers, posters, purchase a billboard, or pursue any other avenue of marketing. The "advertising" through the Banner Program is not free as organizations still must bear the cost of printing hundreds of specialized banners and go through the approval process. *See* ECF No. 4 at 10–12. The motivation for choosing this avenue of advertising resembles choosing a license plate over a bumper sticker because the government property and prominence at issue lends an event an air of legitimacy and approval from the City. And having an organization's event blanketed across a historic downtown area clearly implies an endorsement to anyone walking down the street. The reasoning in *Walker* thus indicates that the public perception factor supports a finding of government speech in this case.

Lastly, in *Summum*—the park monument case—the Supreme Court held that the public perception factor weighed towards government speech. 555 U.S. at 471. There the Supreme Court reasoned that "[i]t certainly is not common for property owners to open up their property . . . [to] convey a message with which they do not wish to be associated." *Id.* As a result, "persons who

12

observe donated monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf." *Id.* This reasoning was reinforced because "[p]ublic parks are often closely identified in the public mind with the government unit that owns the land." *Id.* at 472. Further, "[c]ity parks . . . commonly play an important role in defining the identity that a city projects to its own residents and to the outside world." *Id.* So governments, knowing their cultural impact, "select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture." *Id.*

Like the public parks at issue in *Summum*, the City's downtown area, gathering places, and streets are traversed by citizens and visitors every day, making these areas central to its identity. Indeed, the banners that are hung on public fixtures like light poles help cultivate that identity. The City has esthetic, cultural, and other standards in its policy that shape what kind of message it wants to communicate to the public. *See* ECF No. 18 at 3. And though the message conveyed by each run of banners may change in substance, it does not change in form. The banners proclaim that Fort Worth has a great college football team, Fort Worth has great art exhibits, or Fort Worth has a great rodeo that is coming to town. Consistent in the messaging of every diverse banner is one thing: Fort Worth.

Based on the facts here and the reasoning in *Shurtleff*, *Walker*, and *Summum*, the weight of the public perception factor seems to favor the City. Plaintiff argues, however, that "the City has provided *no facts* that support its defense that the Banner Forum constitutes government speech." ECF No. 27 at 13 (emphasis original). But this is not the City's burden at this stage in the case— it is Plaintiff's burden. *See Future Proof Brands, L.L.C. v. Molson Coors Bev. Co.*, 982 F.3d 280, 288 (5th Cir. 2020) (emphasis added) (cleaned up) ("A preliminary injunction is an extraordinary

13

remedy which should not be granted unless *the party seeking it* has clearly carried its burden of persuasion."). Thus, the public perception factor supports the Court's finding that the challenged banners in this case are government speech.

### C. The City actively shapes and controls the Banner Policy.

In weighing the control factor, courts look to whether the government has "effectively controlled" the speech by exercising "final approval authority" over their selection with articulable and distinguishable criteria. *See Summum*, 555 U.S. at 473. The Court once again conducts its analysis parallel to the three leading cases on the issue— *Shurtleff*, *Walker*, and *Summum*. In doing so, the Court concludes that the City actively shapes and controls the Banner Policy.

In *Shurtleff*—the flag case—the Supreme Court found that the City of Boston did not actively shape and control the flag policy, eliminating the possibility of government speech. 142 S. Ct. at 1592. The Court reasoned that because Boston "had nothing—no written policies or clear internal guidance—about what flags groups could fly and what those flags would communicate," there was no control over the policy. *Id.* And this conclusively placed the flag raisings outside the realm of government speech. *Id.* at 1593. When Boston created a "come-one-come-all" policy and had no standards to control the speech, it necessarily created a forum where free speech reigns. *Id.* at 1592–93. Importantly, however, the Supreme Court still noted that "nothing prevents Boston from changing its policies going forward," and it even gave specific examples of written flag policies of other cities that would likely constitute government speech. *Id.* at 1593.

*Shurtleff* is readily distinguishable on the most important fact of this case: government control. The City maintains a written Banner Policy with identifiable standards of what it wants to communicate through its Banner Program. ECF No. 18 at 3–4.  Once again, banners "are restricted to promotion of special events/exhibits." *Id.* at 3. And the written policy requires that the special events must be "of common interest to the general community, or recognize and/or contribute to

14

the cultural fabric of the City." *Id.* And, most importantly, the director maintains "sole authority to approve banner applications (including design/*content*, location, and installation dates)." *Id.* at 9 (emphasis added). Relying on the reasoning in *Shurtleff*, the control factor thus weighs towards a finding of government speech here.

This "sole authority" to approve clause also places the case squarely in line with *Walker*—the license plate case—as well as *Summum*—the monument case. In *Walker*, the Supreme Court sided with the government because they "maintain[ed] direct control" over license plate designs by "actively" policing the proposals sent in. 576 U.S. at 213. Likewise, in *Summum*, the Supreme Court found that the city "effectively controlled" the messages of the monuments by exercising "final approval authority" over their selection. 555 U.S. at 473. And it found relevant that the city selected its monuments "for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park." *Id.*

There is a comparable record of control in this case. During the 2019 controversy, the City emphasized that under the standards of the policy it concluded that Plaintiff's first event was a "special" event. ECF No. 27 at 11. And though Plaintiff objects that—to its knowledge—no applicant has ever been denied under the Banner Program, here, like in *Summum*, there was an actively controlled policy. *Id.* Governments are well within their right to reserve a power and never use it until necessary.[3] This is especially true because the First Amendment does not require the government to strip itself of all artistic taste or sense of what is culturally important. *See Summum*, 555 U.S. at 470. Indeed, in a functioning democratic society—which the government speech doctrine seeks to protect—governments are allowed to change their mind on the type of speech

---

[3] Indeed, cognizant of the fact that prolonged abandonment of a power does not equal unequivocal forfeiture of that power, the Founders even saw fit to guard against certain rarely used powers. *See, e.g.*, U.S. Const. amend. III.

15

that they engage in as they are "accountable to the electorate and the political process for its advocacy." *Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). Thus, "[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position." *Id.* This is likely what happened between Plaintiff's first and second events, and it points to the City's active involvement in controlling the final authority over the policy.[4] The City actively polices a written policy that maintains specific standards and reserves to itself final approval authority over all content. The control factor thus weighs heavily in the City's favor.

But Plaintiff makes a final attempt to show the City exercises no control and states that this case is nearly identical to *Matal v. Tam*, 582 U.S. 218 (2017). The Court disagrees. In *Matal*, the Supreme Court held that the act of approving trademarks generated by registrants did not amount to government speech and was protected by the First Amendment. *Id.* at 239. Aside from the litany of issues and secondary effects that would result from finding government speech, the Court reasoned that even though the Patent and Trademark Office reviewed and had final authority over every single mark, it did not maintain sufficient control over the nature and content of the marks to properly convey a governmental message in the process. *Id.* The only standard the Trademark Office applied was sometimes turning away "offensive" marks—a negative standard preventing speech and not a positive one engaging in it. *Id.* at 228–29.

To back up its assertions about factual similarities of *Matal*, Plaintiff asserts that "[n]othing in the Banner Policy controls the ideas being expressed by the banners." ECF No. 27 at 10. As proof of this, Plaintiff states that "where the City receives competing applications to display banners on the same lampposts during the same time period, the City's Banner Policy gives it *no discretion* to choose its preferred event or indeed use any subjective criteria to make a selection."

---

[4] Notably, the elected leadership of the City of Fort Worth has changed since 2019.

*Id.* (emphasis original). But this fact is another non-sequitur. To get to the point of having competing applications, both applications must meet the approval criteria of being a "special event." ECF No. 18 at 3. This means that the City must first exercise its judgment to determine whether it wants to platform an event under the provisions laid out in the Banner Policy. That a tie goes to the first applicant or one that has been approved before is merely a mechanism of governance built into the policy. This is entirely different to the comparably arbitrary system of only avoiding "offensive marks." *Matal*, 582 U.S. at 233. And unlike only avoiding the bad, the City through its Banner Program seeks to communicate the good and speak of the best parts of itself. What the City values and promotes may change over time—indeed it already has—but no matter what it promotes, outside of a few narrow issues not present in this case, it is entitled to democratic deference. And, thus, the third factor weighs toward the Court's finding that the Banner Policy constitutes government speech.

*   *   *

Seeing that all three factors weigh towards the conclusion that the challenged banners are government speech, the Court finds that the Banner Policy at issue is government speech, and thus not subject to the First Amendment protections afforded to limited public forums. As such, Plaintiff's claims—which rely on limited public forum protections—do not demonstrate a substantial likelihood of success to warrant injunctive relief.

## IV.     CONCLUSION

"The line between a forum for private expression and the government's own speech is important, but not always clear." *Shurtleff*, 142 S. Ct. at 1587. And because these questions are always nuanced, the Court's reasoning is based on its careful parsing of the leading First Amendment cases against the specific facts of Plaintiff's claims. Having found no substantial

likelihood of success on the merits of Plaintiff's claims, the Court hereby **DENIES** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 3). The Court also finds Plaintiff's Motion for Hearing on Preliminary Injunction (ECF No. 16) to be **MOOT**.

    **SO ORDERED** on this **6th day** of **August, 2023.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**